**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America ex rel., Mary A. Cafasso,<br><br>    Plaintiff-Relator,<br><br>vs.<br><br>General Dynamics C4 Systems, Inc.,<br><br>    Defendant.<br>_____<br>General Dynamics C4 Systems, Inc.,<br><br>    Counter-claimant,<br><br>vs.<br><br>Mary A. Cafasso,<br><br>    Counter-defendant.<br>_____ | No. CV 06-1381-PHX-NVW<br><br>**ORDER** |

Before the court is Plaintiff Mary A. Cafasso's Motion for Recusal (Doc. #107), the Defendant General Dynamics C4 Systems, Inc.'s ("GDC4S") Response (Doc. # 110), and the Reply (Doc. # 111). The motion is denied for the reasons set forth below.

**I.    Statement of the Case**

The Plaintiff filed this action to recover damages for herself and on behalf of the United States under the False Claims Act, 31 U.S.C. §§ 3729-3733. The crux of her claim is that her former employer, GDC4S, misappropriated intellectual property it was paid to develop for the government. She also alleges that GDC4S terminated her

1  employment in retaliation for reporting the issue internally.  GDC4S's counter-claim
2  originated as a state court action against Ms. Cafasso for conversion of company
3  documents.   Apparently, she copied most or all documents on the company's computer
4  hard drive, including privileged information, to take them with her in violation of her
5  employment contract. She argues that she had a right to "preserve" the documents as
6  evidence in support of her claims.  The bulk of this litigation so far has focused on case
7  processing and on what privilege, if any, attaches to these documents.
8       At a scheduling conference held on September 28, 2007, I asked the Defendant
9  whether John Jones, its in-house counsel and a likely witness in the case, was the same
10  John Jones "who was a lawyer at Bryan Cave when I was there in the mid-90s?" (Doc. #
11  104 at 65.)  The defendant answered affirmatively.
12       I was a partner at the Phoenix office of Bryan Cave from 1994 to 1998.  At that
13  time, Bryan Cave was an international law firm with several hundreds of attorneys.
14  According to the Defendant, Mr. Jones joined Bryan Cave in August 1993.  Initially, he
15  worked out of the firm's St. Louis and Kansas City offices, but in the fall of 1996 he
16  relocated to Phoenix.  He became a partner on January 1, 1997.  Mr. Jones and I worked
17  in separate practice groups at the firm.  I worked primarily on business and public law
18  litigation and appellate matters.   Mr. Jones belonged to the Government Contract and
19  Intellectual Property groups.  Although we both attended various firm-sponsored social
20  events in 1997 and 1998, we had no personal or social relationship.  I never saw nor
21  spoke with Mr. Jones after I left the firm on December 31, 1998.
22       Although neither party expressed concern about this relationship at the scheduling
23  conference, two months later Ms. Cafasso filed this motion for recusal.  Her motion sets
24  forth two grounds for my disqualification.  First, she argues that my brief professional
25  association with Mr. Jones mandates my disqualification under 28 U.S.C. § 455(b)(2)
26  because Mr. Jones is likely to be a material witness in the case. This claim fails because
27  she interprets § 455(b)(2) too broadly.  Second, she asserts that I am also disqualified
28  under 28 U.S.C. § 455(a) because one might reasonably question my impartiality.  She

- 2 -

bases this claim on what she characterizes as "pejorative" statements which I have made and my supposedly "disparate treatment" in favor of the defendant. However, when these statements are placed in their proper context, no reasonable person with knowledge of all the facts would question my impartiality.

**II.  Disqualification Under § 455(b)(2) is Not Called For Because Any Testimony Mr. Jones Might Offer Will Concern Events Which Occurred Well After I Left Bryan Cave.**

Ms. Cafasso's primary contention is that 28 U.S.C. § 455(b)(2) requires my automatic recusal. The statute states that a judge shall disqualify himself in the following circumstances:

> Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it.

28 U.S.C. § 455(b)(2). Ms Cafasso argues that the last clause of the statute mandates my recusal because Mr. Jones was formally one of my law partners and he is also likely to testify concerning the matter in controversy.

Ms. Cafasso's § 455(b)(2) claim depends on the meaning of "such lawyer." The phrase is clearly intended to apply to a class of attorneys referred to in the previous clause. Ms. Cafasso argues that it applies to any "lawyer with whom [the judge] previously practiced law." However, this broad interpretation ignores the fact that the scope of the second clause is actually limited to those lawyers "with whom he previously practiced law" and also "served during such association as lawyer concerning the matter" in controversy. The Defendant argues that "such lawyer" should be interpreted in a manner consistent with this narrower class of attorneys.

A review of all authority reveals that only a handful of courts have interpreted the last clause of § 455(b)(2). However, these attempts to give the clause meaning are dicta. For example, in *Faulkner v. Nat'l Geographic Soc'y*, 296 F. Supp. 2d 488 (S.D.N.Y. 2003), a party moved for the disqualification of the trial judge on the basis that his former law partner was a potential material witness in the case, despite the fact that the partner's

- 3 -

1 contact with the matter in controversy arose two years after the judge left the law firm.
2 The court noted that "[i]t is not entirely clear whether [§ 455(b)(2)] is triggered only
3 where the lawyer with whom the judge practiced was a material witness during the period
4 in which the judge and the lawyer were associated in practice . . . or applies whenever a
5 former law firm associate is a material witness." *Id.* at 491.  Ultimately, the court
6 concluded that his partner's involvement in the matter was "immaterial to the propriety"
7 of his decision to sit on the case.  He reasoned that because the partner's connection with
8 the matter post-dated their professional association, there was "no colorable argument that
9 any knowledge [he] might have gained should be imputed to the [judge]." *Id.*  In
10 addition, there was "no affidavit, declaration, or deposition testimony given by [the
11 partner]" as part of the case and his death foreclosed the possibility that he would ever
12 testify before the judge.  Nevertheless, this finding was not essential to the court's holding
13 because it denied the recusal motion on the basis of the movant's delay in seeking relief.
14 *Id.* at 490.

15      Similarly, in *In re Rodgers,* 537 F.2d 1196 (4th Cir. 1976), defendants were
16 charged with using unlawful means to secure passage of a bill in the Maryland state
17 legislature. They moved for recusal of the trial judge based on the fact that the judge had
18 formerly practiced law with an attorney who represented another company that was also
19 engaged in efforts to get the same legislation passed.  The defendants expected to argue
20 that their conduct was no more culpable than that of the company represented by the
21 judge's former partner.  The Fourth Circuit was concerned, however, that the former law
22 partner and his client would "undoubtedly testify about the events that took place before
23 the judge withdrew from his law firm." *Id.* at 1198.   Thus, as in *Faulkner*, the court
24 interpreted the "material witness" provision of § 455(b)(2) as requiring a transactional
25 connection between the subject matter of a former law partner's testimony and work he or
26 she performed while associated with the judge.  Nevertheless, the primary focus of the
27 decision in *In re Rodgers* was the meaning of the terms "matter" and "matter in
28 controversy," not the definition of "such lawyer." *Id.*

The legislative history associated with the relevant amendment to 28 U.S.C. § 455 does address this question. The House Judiciary Committee Report fails to address this particular issue directly. *See* H. Rep. No. 93-1453, *as reprinted in* 1974 U.S.C.C.A.N. 6351. However, it did state, that the purpose of the amendment was to make "the statutory grounds for disqualification of a judge in a particular case conform generally with the recently adopted canon of the Code of Judicial Conduct[,]" a reference to Canon 3C of the 1972 version of the Code of Judicial Conduct adopted by the American Bar Association. *Id.* at 6351. Although the overall structure of § 455 differs slightly from Canon 3C, the language of § 455(b)(2) and Canon 3C(1)(b) is identical. The American Bar Association Reporter's Notes to the Code of Judicial Conduct explicitly answers the question posed concerning the scope of the clause at issue. With respect to Canon 3C, the Notes state:

> The Committee was of the opinion that [a judge] should also disqualify himself in a proceeding if a lawyer with whom he previously practiced law *was a witness* or served as a lawyer *concerning the same matter during such association.*

E. WAYNE THODE, REPORTER'S NOTES TO CODE OF JUDICIAL CONDUCT 63 (American Bar Association 1973) (emphasis added). Thus, the ABA Committee's interpretation of when a lawyer's status as a material witness would require recusal is much more narrow than that which Ms. Cafasso urges. Contrary to her interpretation, "such lawyer" refers to those attorneys who both practiced law with the judge and whose testimony will concern a matter stemming from the period of their professional association.

Ms. Cafasso's argument that there need not be any such relationship between the subject matter of the testimony and work performed during the professional association is also improbable as a matter of language and policy. First, every other ground for disqualification under § 455(b)(2) is dependant on a transactional connection to services performed while a judge practiced law. Nothing in the statute suggests that the last clause should be interpreted differently.

- 5 -

Next, a rule which requires disqualification based solely on a judge's prior professional association with a potential witness is unnecessary and overbroad. In this age of mega-sized law firms, the interpretation for which Ms. Cafasso advocates would result in a per se disqualification rule which is both random and difficult to predict. Moreover, there are other ethical standards which govern when a judge must recuse because of his relationship with a witness. The only other provision requiring automatic recusal based solely on the identity of a witness applies only where a judge, "his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person" is likely to be a material witness in the proceeding." 28 U.S.C. § 455(b)(5)(iv).

"Generally, judges are not required to recuse when they have a casual relationship with a victim, attorney, witness or litigant appearing before the court." *United States v. Sundrud*, 397 F. Supp. 2d 1230, 1233 (C.D. Cal. 2005). Therefore, apart from the familial relationship described in § 455(b)(5), recusal is required only where the level of personal relationship with a witness reaches "the point that the judge can not be impartial or a reasonable person would question the judge's impartiality." *Sundrud*, 397 F. Supp. 2d at 1233. This standard, which is codified in 28 U.S.C. § 455(a), is discussed in greater detail in the next section.

No transactional connection is shown between testimony that Mr. Jones may offer and work he performed before my departure from Bryan Cave on December 31, 1998. According to the Defendant, Mr. Jones left Bryan Cave in June 2000 and joined Motorola's legal department the next month. In approximately April 2001, he was assigned the responsibility of providing legal advice concerning intellectual property to Motorola's government electronics group. In September 2001 that group was sold to the General Dynamics corporation, and it is now incorporated as GDC4S, a separate entity. Mr. Jones joined the Law Department of GDC4S on September 28, 2001. He asserts that this was the first time that he was given the duty to provide legal advice on invention reporting and patent prosecution, the subject matter of Ms. Cafasso's FCA action. The earliest point at which Ms. Cafasso alleges that any misconduct related to her claims may

- 6 -

have occurred is November 2002. (Doc. # 14 at ¶¶ 66-78.)  Therefore, because there is no evidence of the requisite transactional connection between work Mr. Jones performed during our association at Bryan Cave and the matter in controversy, § 455(b)(2) does not require recusal.

### III.  A Third Party Would Not Reasonably Question the Court's Impartiality When Viewing the Record as a Whole

Ms. Cafasso also argues that I should recuse myself because my impartiality in this case might reasonably be questioned.  She is careful to note, however, that she does not assert the presence of actual bias.  I have no actual bias for or against any party in this case.  Because she does not argue that I am subjectively partial, I may appropriately analyze her claim under 28 U.S.C. § 455(a).

 "The test for disqualification under section 455(a) is an objective one: whether a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might be questioned." *United States v. Nelson*, 718 F.2d 315, 321 (9th Cir. 1983).  "The 'reasonable person' in this context means a 'well-informed, thoughtful observer,' as opposed to a 'hypersensitive or unduly suspicious person.'" *Clemens v. United States District Court for the Central District of California*, 428 F.3d 1175, 1178 (9th Cir. 2005) (quoting *In re Mason*, 916 F.2d 384, 385 (7th Cir. 1990)).

#### A.  A reasonable third party would not question my impartiality based on my former association with Mr. Jones

The Supreme Court has held that if a provision in § 455(b) specifically addresses a potential ground for disqualification, then that ground may not logically serve as a basis for questioning a judge's impartiality under § 455(a).  *See Liteky v. United States*, 510 U.S. 540, 552-53 (1994).  Therefore, if a party cannot show that a judge's professional relationship with a potential witness mandates his recusal under § 455(b)(2), she may not alternatively argue that the relationship creates the appearance of impartiality.

In any event, a judge need not recuse himself merely because he has a casual relationship with a witness.  *See Sundrud*, 397 F. Supp. 2d at 1233.  Rather, § 455(a) mandates recusal only where a judge's relationship with a witness would cause a neutral

- 7 -

third party to reasonably question his impartiality. *See United States v. Cole*, 293 F.3d 153, 164 (4th Cir. 2002). The more insignificant the relationship and the greater the temporal distance between contacts, the less likely it is that a judge's impartiality can reasonably be questioned. *See, e.g., id.* (denial of recusal motion not abuse of discretion where judge revealed that key government witness was son of his deceased godparents whom he had not seen in ten years); *United States v. Lovaglia*, 954 F.2d 811, 815-17 (2d Cir. 1992) (denial of recusal motion proper where judge had close personal friendship with victims of crime, but the relationship ended seven or eight years prior to hearing); *Alexander v. Chicago Park Dist.*, 773 F.2d 850, 856-87 (7th Cir. 1985) (judge's impartiality not reasonably questioned where he represented witness 25 years prior to trial because such association was "ancient history"); *Clay v. Doherty*, 608 F. Supp. 295, 300 (N.D. Ill. 1985) (judge's acquaintance with witness who shared mutual and close friends did not require recusal where encounters between the two had been sporadic such that a reasonable observer would not doubt judge's ability to remain impartial).

I have not seen nor spoken to Mr. Jones in more than nine years. Even when we shared a common employer our interaction was minimal. As the previously cited authority reveals, judges have appropriately declined to recuse themselves where the relationship was stronger than the one presented here. Therefore, I am confident that my relationship with Mr. Jones is sufficiently attenuated such that a third party with knowledge of all of the facts would not reasonably question my impartiality.

**B.    Ms. Cafasso's claims that my actions in this case create the appearance of impartiality are insufficient for disqualification because such motions must usually be based on sources of bias or prejudice outside the case itself.**

The Supreme Court has held that, like claims of actual bias, motions filed pursuant to § 455(a) asserting the appearance of bias or prejudice against a party must nearly always be based on sources outside the course of the judicial proceeding at issue. *Liteky*,

- 8 -

510 U.S. at 552-55. Although the Court recognized that there might be exceptions to this "extrajudicial source" rule, it also described two judicial sources which almost never will be sufficient to establish the appearance of impartiality: 1) judicial rulings and 2) judicial remarks made during the course of a trial. *Id.* at 555. Ms. Cafasso's motion initially fails because the balance of her argument is based entirely on these two sources.

### 1. My rulings in favor of the Defendant are not sufficient to show an appearance of bias under § 455(a).

Ms. Cafasso dedicates a significant part of her motion to various rulings in favor of the Defendant. She concludes that my rulings have, more often than not, been contrary to her interests and, therefore, a third party might reasonably question my impartiality. However, a motion for recusal ordinarily may not be based on "prior rulings in the proceeding, or any proceeding, solely because they were adverse." *Clemens*, 428 F.3d at 1178-79. When no extrajudicial source is involved, judicial rulings may serve as the basis for disqualification only "in the rarest of circumstances" where they "evidence the degree of favoritism or antagonism" which would "make fair judgment impossible." *Liteky*, 510 U.S. at 555.

While the Court in *Liteky* did not discuss what showing a party would have to make in order to meet this burden, it is clear that she must show something more than a disproportionate number of decisions in her opponent's favor. Litigation is not egalitarian to the extent that courts must allocate rulings equally in favor of each side, regardless of the merits. "A trial judge must be free to make rulings on the merits without the apprehension that if he makes a disproportionate number in favor of one litigant, he may have created the impression of bias. Judicial independence cannot be subservient to a statistical study of the calls he has made during the contest." *In re International Business Machines Corp.*, 618 F.2d 923, 929 (2d Cir. 1980). Therefore, the allegedly disproportionate number of rulings which I have made in favor of GDC4S does not establish Ms. Cafasso's claim of the appearance of impartiality.

- 9 -

1    Moreover, even assuming that my rulings did show a disposition against Ms.
2 Cafasso, that opinion would not be a basis for disqualification because it would not be
3 grounded in an extrajudicial source.  "The judge who presides at a trial may, upon
4 completion of evidence, be exceedingly ill disposed towards [a party] who has been
5 shown to be a thoroughly reprehensible person.  But the judge is not thereby recusable for
6 bias or prejudice, since his knowledge and the opinion it produced were properly and
7 necessarily acquired in the course of the proceedings." *Liteky*, 510 U.S. at 551.  Ms.
8 Cafasso does not allege that the rulings which I made in favor of the Defendant were
9 grounded in an extrajudicial source of bias or prejudice against her.  Therefore, even if
10 she were to assert the presence of actual bias, her claim would fail.

11   Nevertheless, her claim that my impartiality might reasonably be questioned also
12 fails because every one of the rulings which she attacks in her motion was explained and
13 correct.  First, Ms. Cafasso condemns my alleged "inconsistent" treatment of orders
14 adopted from the state court.  She does not specifically cite which state court order I
15 "overturned" in favor of the Defendant, but it appears that it related to its duty to identify
16 documents in support of its counterclaim.  However, I never relieved the Defendant of
17 this responsibility.  Instead, I established a case management plan which requires Ms.
18 Cafasso to identify the documents which support her *qui tam* claim first.  This was the
19 only practical course of action given that the Defendant's counterclaim is dependent on
20 which documents Ms. Cafasso puts forth in support of her own claim.

21   I also upheld the state court order which allowed Ms. Cafasso to access the
22 documents at issue only in her attorney's office because I accepted the Defendant's
23 argument that this restriction was necessary to protect the sensitive information contained
24 therein.  However, I also told Ms. Cafasso's counsel that I was willing to reconsider the
25 order if they could "make a persuasive showing that [the state court judge] erred or was
26 clearly wrong" when he issued it.  (Doc. # 104 at 52:3-6.)  To date, her counsel has not
27 tried to make any such showing.  I did not impose similar restrictions on the Defendant
28 because I concluded that GDC4S had a "history" of being "forthcoming" and such clients

1 "usually are subject to very good lawyer control." (Doc. # 21 at 64: 2-7.) Moreover, all the disputed documents belong to the Defendant, and Ms. Cafasso has never suggested that the Defendant is not entitled to its own documents.

Ms. Cafasso also decries my allegedly disparate treatment concerning the parties' sealing of documents. Specifically, she complains that despite my order prohibiting the parties from filing documents under seal, I failed to penalize the Defendant for moving to seal its Motion to Strike. However, her displeasure is unfounded because I never issued any such order. While I did say that I would not grant a "general" or "blanket" sealing order, I also clearly stated that I would allow "anybody [to] file a motion to seal any particular document" as long as it is accompanied by a statement showing an "articulatable focused need" for shielding the filing from the public. (*Id.* at 107:19 - 108:2.)

Finally, Ms. Cafasso questions the motivation behind my order to lift the seal on her *qui tam* claim before the government made its intervention decision. She suggests that, to a neutral third party, it might appear that it was a result of my discovery of Jones's involvement in the case. However, I lifted the seal on all materials except the amended complaint (which was made available to all parties and counsel, including GDC4S) at the November 2006 status conference. Moreover, I clearly stated that I found "very substantial good cause" for lifting the seal. (Doc. # 21 at 98: 8-9.) Specifically, I was troubled by the seal's "serious disruption to the state court action" (*id.* at 53: 7-9) and the fact that GDC4S's knowledge of Ms. Cafasso's claim eliminated any need to keep it secret (*id.* at 46: 19-20, 48: 1).

None of these rulings evidence any favoritism or antagonism, much less favoritism or antagonism to a degree which would make fair judgment impossible. "Almost invariably, [judicial rulings] are proper grounds for appeal, not for recusal." *Liteky*, 510 U.S. at 555. Therefore, if Ms. Cafasso is displeased with my rulings, she has the option to list them as grounds for appeal of my ultimate decision, not to try her chances with another judge.

### 2. My statements in the record do not reasonably call my impartiality into question.

Judicial remarks "that are critical of or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality charge." *United States v. Martin*, 278 F.3d 988, 1005 (9th Cir. 2002) (quoting *Liteky*, 510 U.S. at 555 ). As with judicial rulings, if such remarks do not reveal an opinion that derives from an extrajudicial source, then they may only support a charge of impartiality if they "reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky*, 510 U.S. at 555; *F.J. Hanshaw Enters, Inc. v. Emerald River Devel., Inc.*, 224 F.3d 1128, 1145 ("[W]here the [alleged] partiality develops during the course of the proceedings, it can be the basis of recusal only where the judge displays a deep-seated and unequivocal antagonism that would render fair judgment impossible.") As an example of this extreme kind of bias, the *Liteky* Court cited *Berger v. United States*, 255 U.S. 22 (1921). There, in a World War I espionage case against German-American defendants, the judge commented, "One must have a very judicial mind, indeed, not to be prejudiced against the German-Americans in this country. Their hearts are reeking with disloyalty. This defendant is the kind of a man that spreads this kind of propaganda, and it has been spread until it has affected practically all Germans in this country." *Id.* at 28-29.

Ms. Cafasso does not assert that I have made any statements which reveal such a high degree of favoritism for the Defendants or an unequivocal antagonism against her. Instead, she argues that a neutral party might reasonably question my impartiality based on statements I made which she says characterize her in a "pejorative" manner. Specifically, she claims that I repeatedly referred to her as a "document thief" and inappropriately labeled the conduct she used to obtain GDC4S's documents as "breaking in," "burglarizing," and "stealing." These statements are not, however, cited in their proper context. Review of the actual record forecloses the possibility that an objective third party might, based on these statements, question my impartiality.

- 12 -

1    Ms. Cafasso lifted these statements from an exchange between me and the
2  Assistant United States Attorney about the legal basis of her defense against the
3  Defendant's counter-claim.  In exploring the limits of any right a FCA relator might have
4  to conduct her own investigation of her claims, I asked the AUSA whether "the False
5  Claims Act gives document thieves rights in the documents they steal." (Doc. # 21 at 53:
6  21-22.)  In response to the AUSA's answer, I asked whether a relator could "break into a
7  building, burglarize it, steal documents, and be immunized from court process for that if
8  they are going to use it in furtherance of a False Claim Act." (*Id.* at 54: 3-6.)  Then I
9  asked whether Ms. Cafasso's actions could be likened to that type of conduct. (*Id.* at 54:
10 8-10.)  I never called Ms. Cafasso a "document thief" and did not, as she alleges, ask these
11 questions in an attempt to "prejudge" the case "before vetting the facts."  A neutral third
12 party familiar with courtroom proceedings would know that judges often promote legal
13 debate by eliciting responses to hypothetical questions.

14   Ms. Cafasso also suggests that I improperly "mused about buying stock" in
15 GDC4S.  In jest, I said: "And let's see, I was thinking of buying some stock in General
16 Dynamics.  But no.  No, I won't do that. Actually, that would be terrible if I did that.  But
17 I could get away with it, couldn't I?" (Doc. #21 at 88:2-5.)  This attempt at humor in a
18 tense proceeding was a failure.  Since taking judicial office I have acquired no individual
19 stocks, and I have divested all but a few individual stocks I personally owned.  An
20 objective third party would not reasonably conclude that I seriously contemplated any
21 such purchase.

22   Next, Ms. Cafasso argues that a "neutral party might question whether the court
23 already had prejudged the case" because I "indicated that '[the Defendant is] going to get
24 relief of some greater or lesser extent.'"  Again, Ms. Cafasso omitted a large part of my
25 statement.  When stated in its full context, the comment reads: "But unless you succeed in
26 proving that every single one of those 21,000 documents were within the privilege, they
27 are going to get relief of some greater or lesser extent." (Doc. #21 at 60: 1-5.)  This was
28 not a prejudgment of the merits of the case, but an expression of my view on one of the

- 13 -

1 legal questions at issue.  Such commentary may not serve as the basis for a motion to
2 disqualify.  *See United States v. Conforte*, 624 F.2d 869, 882 (9th Cir. 1980).
3       Ms. Cafasso also claims that I improperly "suggested arguments or strategies
4 favoring the defendant" by expressing concern about the sufficiency of her complaint.  At
5 a status conference held on November 15, 2006, I told her attorney that her complaint
6 "[did] not appear" to conform with Fed. R. Civ. P. 8(a)(1) and "clearly" did not comply
7 with Rule 10(b).  Ms. Cafasso asserts that a neutral third party might view this as
8 improper because it appeared that I was coaching the Defendant on possible defenses.
9 However, a third party who is familiar with pre-trial proceedings would know that trial
10 judges commonly note deficiencies in pleadings that might warrant early scrutiny, either
11 to be cured or to narrow the case.  Such commentary, made in open court, is meant to
12 ensure the efficient and prompt resolution of the controversy at issue, not to "coach" any
13 particular party.  The excessive length and somewhat disorganized character of the
14 complaint was a burden on the court, which is not powerless to protect itself from
15 violations of the rules of pleading.
16       Similarly, Ms. Cafasso asserts the appearance of bias from my "urg[ing] [of the
17 Defendant] not to feel pressure to waive its right to respond" to her Motion to Lift the
18 Seal on the Pleadings and Motions Filed in Response to the Amended Complaint.  This
19 claim stems from a dialogue with the Defendant's counsel during a status conference held
20 in February 2007.  At that time, I had recently received Ms. Cafasso's motion and,
21 although GDC4S had not yet had a chance to formally respond to it, I heard arguments on
22 the motion from both parties.   In turn, I made a preliminary ruling on the motion in the
23 Defendant's favor, but reserved the right to change that decision after further
24 consideration.  (Doc. # 44 at 12: 3-6.)  When the Defendant informed me that it was
25 comfortable with the oral arguments it had just made and did not see any need to file
26 further briefing, I cautioned that I was "not trying to pressure anybody into waiving any
27 right to respond." (*Id.* at 13: 9-11.)  This warning was not an attempt to "urge" the
28

1  Defendant to file a response, but a notice to all parties that I would consider a written
2  response if the Defendant wished to exercise its right to file one.
3       At the November 2006 status conference, I said that I would need briefing on the
4  issue of which party would have the initial burden of reviewing the volumes of
5  documents in Ms. Cafasso's possession. However, at the September 2007 scheduling
6  conference, I concluded that I would not need any briefing on the matter. (Doc. # 104 at
7  28: 24.) According to Ms. Cafasso, this decision denied her the opportunity "to brief a
8  key issue" and adds to the appearance of bias and impartiality. Ms. Cafasso
9  mischaracterizes my decision as a capricious reversal of my earlier conclusion. In fact,
10 the transcript from the September 2007 conference shows that I heard extensively from
11 both sides on this issue. I made my decision after considering all arguments, noting my
12 inherent power to manage discovery, and analyzing the parties' duties under Rule 26(a).
13 (*Id.* at 22:22 - 24:22.) I concluded that the most efficient resolution would be for each
14 party to present its case to the other. Under the case management plan Ms. Cafasso
15 would first identify those documents which support her FCA claims and then GDC4S
16 would identify those documents supporting its counterclaims. I viewed this schedule as
17 fair given that "the real focus of the dispute on the [Defendant's] counterclaim really is
18 affected by or dependent upon what the plaintiff puts forward as the basis for her *qui tam*
19 action." (Doc. # 104 at 35:12-15.) A neutral third party who is aware of the procedural
20 history in this case would not reasonably question my impartiality based on this decision.
21      Finally, Ms. Cafasso asserts that the deadlines associated with the case
22 management plan also raise a question of bias. In her reply she complains that although I
23 have repeatedly said that I would not make attorneys work through the holidays, I
24 "compelled [her] to perform the single largest discovery task in this case" with a deadline
25 of December 31, 2007. However, at the September 2007 scheduling conference I stated
26 that I anticipated that she could complete the task by mid-December and that a deadline at
27 the end of the month would provide her with additional time. (*Id.* at 46: 22-25.) The
28 December 31 deadline actually benefitted, rather than prejudiced, her counsel. In setting

1  the schedule, the holiday break would have been subtracted from the Plaintiff's time or
2  added to the Defendant's time. I said this expressly to her counsel. *Id.* By adding the
3  holiday time to her deadline, her counsel was not prejudiced.

4      The remarks upon which Ms. Cafasso relies do not evidence a deep-rooted
5  favoritism or antagonism which would make fair judgment impossible. They do not
6  evidence any bias at all. Therefore, they cannot serve as a basis to reasonably question
7  my impartiality and Ms. Cafasso's motion for recusal based on § 455(a) must fail.

8  **IV.     Ms. Cafasso's Motion Also Fails Because it is Untimely**

9      Although Ms. Cafasso's motion is unsuccessful on its merits, it will also be denied
10 because of the unreasonable delay in bringing her challenge. Motions to disqualify must
11 be timely because "the absence of such a requirement would result in increased instances
12 of wasted judicial time and resources . . . and a heightened risk that the litigants would
13 use recusal motions for strategic purposes." *Preston v. United States*, 923 F.2d 731, 733
14 (9th Cir. 1991) (citations omitted). Although "no per se rule exists" regarding the
15 timeliness of recusal motions, the Ninth Circuit has said that they "should be filed with
16 reasonable promptness after the ground for such a motion is ascertained." *Id.*

17     Ms. Cafasso argues that my recusal is required under two separate statutes, 28
18 U.S.C. § 455(a) and § 455(b)(2). Because she asserts different bases of disqualification
19 for each ground, the timeliness of each must be analyzed independently. First, her §
20 455(a) claim is plainly untimely because it is supported by instances of "bias" which date
21 back to more than a year before she filed her motion. In the past year I have devoted
22 substantial time and resources to this case, all of which would have been unnecessary if
23 Ms. Cafasso had a valid basis for recusal under § 455(a). She had a duty to file her
24 motion before any additional judicial resources might be wasted. However, Ms. Cafasso
25 does not even try to explain why this delay was reasonable.

26     Ms. Cafasso's § 455(b)(2) claim is also untimely. Even assuming that her counsel
27 were not aware of my former association with Bryan Cave before it was discussed on
28 September 28, 2007, she does not explain why she waited two months to file her motion.

1 Given the straightforward nature of her § 455(b)(2) motion, she did not need nearly nine
2 weeks to prepare it. There is no reason that the motion could not have been filed in a
3 week or two. Therefore, Ms. Cafasso did not act in a reasonably prompt manner.

4     In her reply, Ms. Cafasso argues that the timeliness of her motion should not be
5 measured in some "absolute and arbitrary manner from the date of discovery," but on the
6 effect of its delay on the court and the trial. Ms. Cafasso's motion fails even that measure
7 of timeliness. Her counsel was aware that the Defendant would file notice of a discovery
8 dispute on November 29, 2007. He had been in the midst of that dispute since October
9 25, 2007, which concerned discovery for which he faced an impending deadline. This
10 court's practice is to hear and rule on discovery disputes within a day or two of receipt.
11 Ms. Cafasso's motion was conveniently filed on November 28. Consequently, I could not
12 resolve the discovery dispute unless I first determined that I was not disqualified. Ms.
13 Cafasso has, in effect, granted herself a seven week continuance on the discovery issues
14 by the strategic timing of her delayed motion for recusal. Plaintiff's motion for recusal
15 under 28 U.S.C. § 455(b)(2) is independently barred because it is also untimely.

16     IT IS THEREFORE ORDERED that the Plaintiff's Motion for Recusal (Doc. #
17 107) is DENIED.

18     DATED this 16th day of January, 2008.

_____
Neil V. Wake
United States District Judge

- 17 -