1  **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                      FOR THE DISTRICT OF ARIZONA

8

9  United States ex rel. Mary A. Cafasso,   )   No. CV 06-1381 PHX NVW
                                            )
10            Plaintiff-Relator,            )   **ORDER**
                                            )
11  vs.                                     )
                                            )
12                                          )
   General Dynamics C4 Systems, Inc.,       )
13                                          )
              Defendant.                    )
14  _____  )
                                            )
15                                          )
   General Dynamics C4 Systems, Inc.,       )
16                                          )
              Counterclaimant,              )
17                                          )
   vs.                                      )
18                                          )
   Mary A. Cafasso,                         )
19                                          )
              Counterdefendant.             )
20  _____  )

21        Before the Court are Relator's Motion for Summary Judgment on Defendant's

22  Counterclaims (doc. #275) and GDC4S's Motion for Partial Summary Judgment on:  (1)

23  Count II of Relator's Substitute Amended Complaint (Retaliation) and (2) Count I of

24  GDC4S's Counterclaim (Breach of Contract) (doc. #272).

25  **I.    Legal Standard for Summary Judgment**

26        The court should grant summary judgment if the evidence shows there is no

27  genuine issue as to any material fact and the moving party is entitled to judgment as a

28  matter of law.  Fed. R. Civ. P. 56(c).  The moving party must produce evidence and

1  persuade the court there is no genuine issue of material fact. *Nissan Fire & Marine Ins.*
2  *Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To defeat a motion for
3  summary judgment, the nonmoving party must show there are genuine issues of material
4  fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A material fact is one
5  that might affect the outcome of the suit under the governing law. *Id*. at 248. A factual
6  issue is genuine "if the evidence is such that a reasonable jury could return a verdict for
7  the nonmoving party." *Id*. When the moving party has carried its burden under Rule
8  56(c), the nonmoving party must produce evidence to support its claim or defense by
9  more than simply showing "there is some metaphysical doubt as to the material facts."
10  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Where the
11  record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving
12  party, there is no genuine issue of material fact for trial. *Id.*

13      In this context, the court presumes the nonmoving party's evidence is true and
14  draws all inferences from the evidence in the light most favorable to the nonmoving party.
15  *Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1289 (9th Cir. 1987). If the
16  nonmoving party produces direct evidence of a genuine issue of fact, the court does not
17  weigh such evidence against the moving party's conflicting evidence, but rather submits
18  the issue to the trier of fact for resolution. *Id.* "[T]he court should give credence to the
19  evidence favoring the nonmovant as well as that 'evidence supporting the moving party
20  that is uncontradicted and unimpeached, at least to the extent that that evidence comes
21  from disinterested witnesses.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.
22  133, 151 (2000).

23      Therefore, the narrative that follows states the disputed facts in favor of Relator
24  Mary A. Cafasso.

25
26
27
28

1   **II.     Background**

2         **A.     Factual History**

3         In September 2001, General Dynamics Corporation hired Cafasso when it acquired

4   the assets of the Motorola, Inc., business unit in which Cafasso worked.  In 2003, General

5   Dynamics Corporation merged the former-Motorola unit with another subsidiary

6   corporation, which was based in Tauton, Massachusetts.  The resulting merged

7   corporation was named General Dynamics C4 Systems, Inc. ("GDC4S") and based in

8   Scottsdale, Arizona.  Before the 2003 merger, Mark Fried served as the President of the

9   former-Motorola unit in Arizona and Christopher Marzilli served as the Vice President of

10  Commercial Hardware Systems for the Massachusetts unit.  After the merger, Fried was

11  appointed President of GDC4S, and Marzilli was appointed the Senior Vice President and

12  Deputy General Manager of GDC4S.  Marzilli spent the majority of his time at the

13  Massachusetts location and had primary responsibility for managing the operations at that

14  location.

15        Cafasso was employed as the Chief Scientist/Technologist and reported to

16  GDC4S's Vice President and Chief Technology Officer, Erling Rasmussen.  Cafasso's

17  responsibilities included coordinating GDC4S's intellectual property portfolio and

18  ensuring GDC4S's compliance with its Government contracts.  She was responsible for

19  seeing that GDC4S met its obligations to protect the United States Government's interest

20  in intellectual property developed pursuant to Government contracts.  She also chaired all

21  meetings of the Technology Transfer Review Board ("TTRB"), which reviewed proposed

22  transfers of intellectual property to and from GDC4S, and assisted in functions of the

23  TTRB.

24        As early as February 2002, GDC4S had a policy that in determining whether

25  resources should be invested in pursuing a patent application, its business decision-

26  makers should consider, among other factors, whether an invention had only Government

27  application and the Government already had unlimited rights in the invention.  If the only

28

1   customer who could use the invention was the Government, and the Government already

2   held unlimited rights to use the invention, then a patent may not provide any value to

3   GDC4S and may not warrant substantial allocation of resources.  Moreover, many of

4   GDC4S's inventions cannot be disclosed as the patent process would require because they

5   involve United States classified information or technical information that international

6   traffic in arms regulation and federal law prohibits placing into the public domain.

7          In February 2004, Cafasso received a voice mail from a senior engineer that led

8   her to believe GDC4S planned to delay, within contractual limits, giving notice to the

9   Government of GDC4S's intention to abandon patent prosecution on inventions in which

10  the Government had intellectual property rights.  The delay would increase the risk that

11  the Government would miss its opportunity to pursue the patent process and likely would

12  enable GDC4S to retain the inventions as trade secrets.  Cafasso believed GDC4S was

13  defrauding the Government by failing to protect the Government's interest in inventions

14  developed under Government contracts.  She further believed GDC4S's actions were in

15  violation of federal regulations governing its contracts and of GDC4S's TTRB policy.

16  She believed GDC4S took these actions under the direction of John Jones, an intellectual

17  property attorney in GDC4S's Law Department.  Cafasso reported her concerns to

18  Rasmussen, who does not recall relaying them to anyone else, but testified it was possible

19  he conveyed them to the Law Department.  Rasmussen did not talk to Marzilli about

20  Cafasso's concerns.

21         On October 27, 2004, then-Internal Compliance Manager Tim Pawlak sent an

22  email to Rasmussen, Cafasso, and another CTO employee requesting input on possible

23  audit topics for 2005.  On November 2, 2004, Cafasso responded to the email and

24  requested an audit of the Law Department based on:  "Legal agreements NOT being

25  compliant with the approved Transfer of Technology Review Board (TTRB).  Business

26  policies not being followed OM 1.5."  Cafasso's email identified four of six adverse

27  effects of the subject of her audit request:  "failure to safeguard company assets,"

28                                         - 4 -

1   "financial loss and exposure," "erroneous record keeping," and "failure to adhere to

2   organizational policies, plans, and procedures." She did not identify "failure to adhere to

3   government regulations" or "negative publicity." Cafasso did not copy anyone on her

4   email to Pawlak.

5           On November 11, 2004, Cafasso met with Pawlak to discuss her audit request.

6   Cafasso told Pawlak she believed Jones and the Law Department were not complying

7   with GDC4S's intellectual property policy and federal regulations. She did not tell

8   Pawlak the Law Department was engaging in fraud or use the word "fraud" in her

9   discussion with Pawlak although at some point she used the word "fraud" in oral

10  communications with Rasmussen.

11          Also in November 2004, Cafasso exchanged emails with Devon Engel, Jones's

12  supervisor in the Law Department, with a copy to Rasmussen. In these emails Cafasso

13  told Engel she believed Jones was violating company policy and intended to continue to

14  violate company policy. She did not refer to "fraud" or submission of false claims or

15  statements to the Government. Engel responded that the TTRB policy was created by

16  Motorola, a predominantly commercial company, and GDC4S may deviate from the

17  policy in some circumstances for strategic business purposes and/or because of federal

18  laws and regulations.

19          In Engel's opinion, the roles of the Law Department and the CTO were not clearly

20  defined and led to conflict between Jones and Cafasso. Both Engel and Jones found

21  Cafasso to be difficult to work with.

22          In January 2005, Cafasso was notified her audit request did not receive a high

23  enough ranking based on identified factors to be included in the internal controls 2005

24  audits. In email communications with Pawlak, Cafasso referred to her request as "the

25  TTRB process audit of legal contracts" and said "this issue requires attention to enforce

26  company policy." Pawlak referred to it as "the TTRB issue" and described the end result

27  of such an audit as "compliance to policies." He offered to conduct a less formal review

28

                                            - 5 -

after receiving more information from Cafasso.  She provided Pawlak a copy of her November 2004 email exchange with Engel.  The last correspondence Pawlak received from Cafasso regarding her audit request was in early January 2005.  In October 2005, Pawlak sent Cafasso an email asking for her suggestions for possible audits in 2006, but received no response from Cafasso.

By mid-2005, Fried expressed his intent to retire at the year's end, and Marzilli began preparing to assume the presidency of GDC4S.  As President, Marzilli intended to address integration issues that had not been resolved since the 2003 merger of the two previously distinct businesses.  In Marzilli's opinion, one of the inconsistencies between the two businesses was the centralization of certain functions in the Chief Technology Office ("CTO") for Arizona operations that were decentralized for the Massachusetts operations.  By mid-November 2005, Marzilli decided to establish a new organizational structure to reduce redundancies and inconsistencies and effect cost savings.  The new organizational structure eliminated a number of central departments in Massachusetts and Arizona, including the CTO in Arizona.  At the time Marzilli decided to eliminate the CTO, he had no knowledge Cafasso ever had requested an audit of the Law Department, complained about the Law Department, expressed concern about suspected fraud to Rasmussen, or raised internal complaints about any issue at any time.

Following Marzilli's decision to reorganize, functions of the CTO were assigned to other parts of GDC4S.  All functions of managing GDC4S's intellectual property were assigned to the Law Department.  Technology planning and other centralized engineering functions were assigned to the Engineering Leadership Team.  The reorganization resulted in the resignations or retirements of several executives such as the Vice President of Information Technology; the Vice President of Communications, Customer and Community Services; the Vice President of Programs and Integration; the Director of Strategic Planning; and Chief Technology Officer Rasmussen.

- 6 -

1    In November 2005, Cafasso talked to Rasmussen again about her concerns about

2  Jones and the Law Department.  Later in November 2005, Rasmussen resigned and

3  retired, which left Cafasso and an administrative assistant as the CTO's only remaining

4  employees.  The administrative assistant was transferred to another department.  In

5  December 2005, Cafasso was told the Chief Technology Officer position would be

6  eliminated.

7    On January 11, 2006, Cafasso met with Marzilli, who directed Cafasso to speak

8  with the Vice President of Strategic Initiatives about a possible position for her.  Cafasso

9  did not use the word "fraud" when she talked to Marzilli about issues she felt needed

10  attention, including policy compliance and the CTO's roles and responsibilities.  She did

11  not inform Marzilli she was contemplating filing a False Claims Act *qui tam* action.

12    On February 9, 2006, in response to an email from Cafasso, Marzilli emailed her

13  that with "the disestablishment of the office of the CTO," he was taking the opportunity

14  to unify the policies and procedures of the two previously distinct businesses merged in

15  2003.  Cafasso responded on February 9, 2006, that she had expected to be involved and

16  have input into decisions regarding functions of the CTO office.  She expressed particular

17  concern about "compliance issues regarding IP management which we have had issues

18  with in the past."  By February 13, 2006, Cafasso had been told CTO functions would be

19  covered by other departments.

20    On March 2, 2006, Cafasso was notified her position would be eliminated and

21  given sixty days notice to find another position within General Dynamics Corporation or

22  be discharged.  Cafasso was advised her CTO-related job duties had been assigned to

23  others.  Cafasso applied for approximately twenty-five positions within General

24  Dynamics Corporation, but was not offered any of those positions.

25    In or about the first week of March 2006, Cafasso contacted Mark Vrla, a partner

26  with a law firm serving as outside counsel for GDC4S for intellectual property matters.

27  Cafasso asked Vrla to provide information about certain patent applications the firm

28

1   tracked and/or prosecuted for GDC4S.  She also asked Vrla for legal advice regarding

2   GDC4S's obligations under certain Government contracts.  Vrla subsequently responded

3   to Cafasso's requests.

4          On April 3, 2006, Bernadette Phillips-Garcia, GDC4S's Senior Human Resources

5   Manager, informed Cafasso she would be discharged in thirty days if she did not find a

6   new job.  On April 13, 2006, Phillips-Garcia sent Cafasso an email providing job-seeking

7   advice, offering further job-seeking assistance, and reminding her she was expected to

8   spend the sixty days focusing on her job search because all of her work already had been

9   transitioned to others.

10          On April 2006, Cafasso had two telephone conversations with Ken Spitza, a

11   procurement fraud adviser for the United States Army and told him she was concerned

12   GDC4S might destroy documents to prevent detection of what Cafasso perceived to be a

13   scheme to defraud the Government.  Spitza thought Cafasso was the custodian of the

14   records she wanted the Government to examine and told her the Government had the right

15   to look at documents evidencing, or that could lead to evidence of, fraud or contractual

16   violation.  Spitza and Cafasso did not discuss specifically what Cafasso could or could

17   not copy.  Spitza never received any documents directly from Cafasso.

18          On May 1, 2006, Phillips-Garcia met with Cafasso to inform her it appeared she

19   was not going to be successful in her internal job search and she would be discharged

20   from GDC4S on Friday, May 5, 2006.  Phillips-Garcia informed Cafasso her exit meeting

21   was scheduled for 9:30 a.m. on May 5, 2006, gave Cafasso the standard exit materials to

22   review, and told her the exit documents must be signed before or during her exit interview

23   on May 5, 2006.  The exit documents included confirmation the departing employee had

24   returned all General Dynamics Corporation property and secured all classified material

25   and a reminder the employee had a non-disclosure obligation and obligation to return any

26   documents, computer files, "and the like" that contain or embody proprietary information

27   before departing.  The exit documents also included a document requiring the departing

28

1  employee to reaffirm his obligations regarding safeguarding of classified information and

2  that he had returned all classified information in his custody.  During the May 1, 2006

3  meeting, Phillips-Garcia also gave Cafasso a severance agreement reflecting General

4  Dynamics Corporation's standard severance package for job elimination.

5          On May 4, 2006, Jones learned Cafasso had requested and obtained copies of two

6  GDC4S confidential documents from Bob Wigington, the Intellectual Property Manager

7  in the Law Department.  On May 5 and 6, 2006, a GDC4S Information Security Engineer

8  performed a forensic analysis of Cafasso's computer to determine whether the computer

9  had been used to copy, transfer, or otherwise misappropriate GDC4S confidential

10 information.

11         The forensic examination determined that between April 29, 2006, and May 4,

12 2006, Cafasso downloaded onto her computer more than ten gigabytes of GDC4S's

13 confidential, proprietary, and trade secret information and that removable data storage

14 devices were connected to her computer at various times during that period.  Although the

15 forensic examination could not determine that files were actually copied to the removable

16 data storage devices, Cafasso subsequently produced to GDC4S twenty-one CDs of

17 documents and data she had copied from GDC4S's files.  The examination also

18 determined that between April 18, 2006, and April 29, 2006, she downloaded from the

19 GDC4S computer network 26,690 emails and attachments (approximately 4.4 gigabytes)

20 she had sent or received from 2001 through 2006.  In addition to some personal files and

21 large media files she had stored on her GDC4S computer, the files Cafasso copied

22 include:

23         –approximately 31,762 files organized into approximately 1,862 separate folders

24 from the years 1996 to 2006;

25         –email and other communications between GDC4S attorneys and its employees;

26         –trade secrets appearing to belong to GDC4S, GDC4S affiliates, General

27 Dynamics Canada, Ltd., and third parties such as Lockheed Martin and Motorola;

28

1  –GDC4S's internal research and development information;

2  –Sensitive But Unclassified Government Information controlled by the

3  International Traffic in Arms Regulations; and

4  –at least one patent application that in 1998 the United States Patent Office placed

5  under a secrecy order to protect national security.

6  Cafasso admitted she obtained and downloaded electronic copies of documents

7  and data related to technology development in general and those within folders containing

8  at least one file that appeared to be related to technology development without reviewing

9  individual files to determine whether they could be relevant to her concerns about fraud

10  or noncompliance with company policies or federal regulations.  She testified she

11  removed copies of these files because she was concerned that documents would be

12  destroyed because two databases would no longer be used after certain CTO functions

13  were transferred to the Law Department.

14  Cafasso did not attend the scheduled May 5, 2006 exit meeting with Phillips-

15  Garcia or call to cancel it.  On Monday, May 8, 2006, Phillips-Garcia called Cafasso and

16  sent a letter to Cafasso via hand-courier notifying her to meet with Phillips-Garcia at

17  10:00 a.m. on May 9, 2006, for her exit interview.  She also reminded Cafasso she was

18  obligated to return GDC4S's property and proprietary information in her possession.

19  Cafasso did not appear for her exit interview on May 9, 2006.

20  After Cafasso did not appear for an exit interview on May 9, 2006, Phillips-Garcia

21  sent a second letter to Cafasso's home via Federal Express, explaining her legal and

22  contractual obligations to return GDC4S's property and proprietary information.  On May

23  11, 2006, GDC4S's then-Senior Employment and Labor Counsel Rebecca Collins sent

24  Cafasso an email stating GDC4S had become aware that in her last days of employment

25  Cafasso had requested proprietary and sensitive data that she had no legitimate business

26  reason to seek and she apparently had downloaded a significant amount of GDC4S's

27  proprietary information onto removable storage devices during her last days at work.

28

1   Collins' email stated Cafasso had until the close of business that day to return all

2   proprietary data in her possession and/or provide GDC4S with written assurances she did

3   not have any such data in her possession.  Cafasso returned her ID badge, keys, remote

4   access card, and cell phone by May 11, 2006, but did not return the computer files she

5   had copied and removed.

6       On May 18, 2006, Wigington told Jones that Cafasso had asked him how GDC4S

7   billed on Government contracts.  The conversation caused Jones to speculate, for the first

8   time, that Cafasso may have been collecting documents and copying files for a *qui tam*

9   action.

10      **B.      Cafasso's Confidentiality Agreement**

11      When Cafasso was hired in September 2001, she signed an Employee

12  Confidentiality and Assignment of Inventions Agreement ("Agreement").  Section 2 of

13  the Agreement is titled Nondisclosure of Confidential Information and includes the

14  following:

15          I recognize that GD is engaged in a continuous program of research
        and development regarding all aspects of its business, technical and
16      otherwise, and that as a GD employee I will have access to Confidential
        Information that has value to GD in part because it is confidential.  During
17      the time of my employment by GD, I will not disclose or use any
        Confidential Information except to the extent I am required to disclose or
18      use such Confidential Information in the performance for [sic] my assigned
        duties for GD; and I will use my best efforts to safeguard the Confidential
19      Information and protect it against disclosure, misuse, espionage, loss and
        theft.

20
        After the termination of my employment with GD, I will not use any
21      Confidential Information or disclose any Confidential Information to any
        person or entity who is not specifically authorized by GD to receive it.
22
    "Confidential Information" is defined to mean:
23
        ...all confidential information and trade secrets (whether or not specifically
24      labeled or identified as "confidential"), in any form or medium, that is
        disclosed to, or developed or learned by me and that relates to the business,
25      products, services, research or development of GD or its suppliers,
        distributors or customers and which has not become publicly known.
26

27

28                                      - 11 -

"Confidential Information" includes, among other things, internal business information, intellectual property of GD, and:

> identities of, negotiations with, individual requirements of, specific contractual arrangements with, and information about, GD's suppliers, distributors, customers, investors, partners and/or other business associates, as well as their confidential information.

Section 5 of the Agreement is titled "Ownership and Return of Materials" and consists of the following paragraph:

> All documents, manuals, lab notebooks, memoranda, letters, customer and supplier lists, computer programs and data, equipment, and other physical property, **including any copies**, which GD makes available to me, which I produce in connection with my services for GD, or which otherwise belong to GD, whether or not such materials contain Confidential Information, shall remain the sole property of GD. **I will not remove any such materials from GD's premises without the prior written consent of a corporate officer of GD. Upon the termination of my employment with GD, or at any time requested, I shall promptly deliver to GD all such materials and copies thereof in my possession and control.** If GD requests, I shall provide written confirmation that I have returned all such materials.

(Emphasis added.)

Section 6 of the Agreement is titled "Noncompliance" and includes the following:

> I acknowledge that my compliance with this Agreement is necessary to protect GD's goodwill and Confidential Information, that my failure to comply with this Agreement will irreparably harm the business of GD, and that monetary damages would not provide an adequate remedy to GD in the event of such non-compliance. Therefore, GD shall be entitled to obtain an injunction and other equitable relief in any court of competent jurisdiction . . . against acts of noncompliance by me of this Agreement, without the posting of bond or other security, in addition to whatever other remedies it may have. . . . In the event that GD is forced to and successfully does enforce this Agreement against me in any court, I will reimburse and indemnify GD for the actual costs incurred by GD in enforcing this Agreement, including but not limited to attorneys' fees.

Section 8 of the Agreement provides:

> This Agreement does not constitute an employment agreement and I understand that I remain an employee at will. This means that I may resign at any time and GD may terminate my employment at any time, with or without cause and with or without notice.

1

### C.      Procedural History

On May 15, 2006, GDC4S filed a Complaint in the Arizona Superior Court for Maricopa County against Cafasso for breach of contract, misappropriation of trade secrets, and conversion.  On May 26, 2006, Cafasso filed in the United States District Court this *qui tam* action for herself and on behalf of the United States against GDC4S and General Dynamics Corporation.  On January 10, 2007, Cafasso served the Defendants.  On January 30, 2007, GDC4S answered and pled six counterclaims:  (1) breach of contract, (2) misappropriation of trade secrets, (3) conversion, (4) breach of fiduciary duty, (5) common law fraud/fraudulent misrepresentation, and (6) computer fraud and abuse.  (Doc. #37.)  On July 5, 2007, the United States notified the Court of its decision not to intervene in this action.

Cafasso's Substitute Amended Complaint includes Count I (False Claims Act Violations) and Count II (Retaliation).  (Doc. #92.)  GDC4S was granted judgment on the pleadings on Count I for failure to state a claim upon which relief can be granted.  (Doc. #219.)  Cafasso now moves for summary judgment on GDC4S's counterclaims, and GDC4S moves for partial summary judgment on its breach of contract counterclaim and Cafasso's retaliation claim.  (Doc. ##272, 275.)  GDC4S seeks injunctive relief enjoining and restraining Cafasso from disclosing or using any of the information she had access to or copied while employed by GDC4S and directing her to execute her exit paperwork and return everything she took from GDC4S (other than employee benefit documents, discharge/severance documents, and payroll documents).  GDC4S also seeks reimbursement of its legal expenses incurred in connection with its state court claims and its federal court counterclaims pursuant to section 6 of the Agreement.

### III.    Count II of Relator's Substitute Amended Complaint (Retaliation)

### A.      The False Claims Act ("FCA")

#### 1.      Liability Under the FCA

The FCA imposes liability on any person who:

1

    (1)  knowingly presents, or causes to be presented, to an officer or
employee of the United States Government or a member of the Armed

2

Forces of the United States a false or fraudulent claim for payment or
approval;

3

    (2) knowingly makes, uses, or causes to be made or used, a false record or

4

statement to get a false or fraudulent claim paid or approved by the
Government;

5

    (3) conspires to defraud the Government by getting a false or fraudulent

6

claim allowed or paid;

7

    (4) has possession, custody, or control of property or money used, or to be
used, by the Government and, intending to defraud the Government or

8

willfully to conceal the property, delivers, or causes to be delivered, less
property than the amount for which the person receives a certificate or

9

receipt;

10

    . . .

11

    (7) knowingly makes, uses, or causes to be made or used, a false record or
statement to conceal, avoid, or decrease an obligation to pay or transmit

12

money or property to the Government . . . .

13   31 U.S.C. § 3729(a).  Subsection (a)(1) "attaches liability, not to underlying fraudulent

14   activity, but to the 'claim for payment.'  What constitutes the FCA offense is the knowing

15   presentation of a claim that is either fraudulent or simply false." *U.S. ex rel. Hopper v.*

16   *Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996).

17       Subsection (a)(7) does not require presentation of a false claim, but instead

18   "requires that a defendant make or use a false record or statement in order to conceal,

19   avoid or decrease an obligation to pay the government." *U.S. v. Bourseau*, 531 F.3d

20   1159, 1169 (9th Cir. 2008).  Subsection (a)(7), known as "the reverse false claims

21   provision," applies only where the United States "was owed a specific, legal obligation at

22   the time that the alleged false record or statement was made, used, or caused to be made

23   or used":

24

    The obligation cannot be merely a potential liability:  instead, in order to be
subject to the penalties of the False Claims Act, a defendant must have had

25

a present duty to pay money or property that was created by a statute,
regulation, contract, judgment, or acknowledgment of indebtedness. . . .

26

The deliberate use of the certain, indicative, past tense suggests that
Congress intended the reverse false claims provision to apply only to

27

existing legal duties to pay or deliver property.

28

1    *Id.*

2         "Violations of laws, rules, or regulations alone do not create a cause of action

3    under the FCA.  It is the false *certification* of compliance which creates liability when

4    certification is a prerequisite to obtaining a government benefit. . . . Mere regulatory

5    violations do not give rise to a viable FCA action." *Hopper*, 91 F.3d at 1266-67.

6                    **2.      FCA Protection from Retaliation**

7         The FCA protects employees from retaliation by their employers for lawful acts

8    done in furtherance of an FCA action:

9              Any employee who is discharged, demoted, suspended, threatened,
              harassed, or in any other manner discriminated against in the terms and
10             conditions of employment by his or her employer because of lawful acts
              done by the employee on behalf of the employee or others **in furtherance**
11             **of an action under this section**, including investigation for, initiation of,
              testimony for, or assistance in an action filed or to be filed under this
12             section, shall be entitled to all relief necessary to make the employee whole.

13    31 U.S.C. § 3730(h) (emphasis added).  To prove a § 3730(h) claim, a plaintiff must

14    prove three elements:  (1) the employee was engaging in conduct protected by the FCA,

15    (2) the employer knew the employee was engaging in protected conduct, and (3) the

16    employer discriminated against the employee because of his or her protected conduct.

17    *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996).  Though *Hopper*'s

18    summary of the statute did not mention it because it was not in play in that case, the

19    statute plainly protects only "lawful acts done by the employee."

20         Although § 3730(h) does not require specific awareness of the FCA, the subsection

21    protects only employees "investigating matters which are calculated, or reasonably could

22    lead, to a viable FCA action."  *Id.*  "[A]n employee engages in protected activity where

23    (1) the employee in good faith believes, and (2) a reasonable employee in the same or

24    similar circumstances might believe, that the employer is possibly committing fraud

25    against the government."  *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838,

26    845 (9th Cir. 2002).  *See also U.S. ex rel. Yesudian v. Howard University*, 153 F.3d 731,

27    740-41 (D.C. Cir. 1998) (FCA-protected activity includes investigating matters that

28                                          - 15 -

1   reasonably could lead to a viable FCA case, but does not require specific awareness of the

2   FCA).

3          "[A] retaliation claim can be maintained even if no FCA action is ultimately

4   successful or even filed." *United States ex rel. Ramseyer v. Century Healthcare Corp.*,

5   90 F.3d 1514, 1522 (10th Cir. 1996).  But "the activity prompting plaintiff's discharge

6   must have been taken 'in furtherance of' an FCA enforcement action." *Id.*  And the

7   defendants must have had notice the plaintiff was acting "in furtherance of" an FCA

8   enforcement action in order for their actions to constitute retaliation. *Id.*  Where a

9   plaintiff merely advised her superiors of noncompliance and warned of consequences for

10  noncompliance, and her monitoring and reporting activities were required to fulfill her

11  job duties, defendants did not have notice the plaintiff was furthering or intended to

12  further an FCA action. *Id.* at 1523; *see Yesudian*, 153 F.3d at 740 (to be covered by the

13  FCA, the plaintiff's investigation must include false or fraudulent claims, something more

14  than his employer's noncompliance with state or federal regulations).

15         Just as there is no requirement a plaintiff know his investigation could lead to an

16  FCA action, there is no requirement the plaintiff inform his employer he is contemplating

17  an FCA action to be protected from retaliation. *Yesudian*, 153 F.3d at 742.  Nor must the

18  employer know, or be advised, the false or fraudulent claims the plaintiff is investigating

19  would violate the FCA. *Id.*  What the employer must know, however, is the plaintiff is

20  engaged in investigations that reasonably could lead to an action under the FCA. *Id.*

21  "[U]nless the employer is aware that the employee is investigating fraud, the employer

22  could not possess the retaliatory intent necessary to establish a violation of § 3730(h)."

23  *Hopper*, 91 F.3d at 1269.

24         Although courts may infer causation based on the proximity between the protected

25  action and the allegedly retaliatory employment decision, such an inference cannot be

26  made where nine months or more lapsed between the two events. *Manatt v. Bank of*

27  *America*, 339 F.3d 792, 802 (9th Cir. 2003).  "Although lack of temporal proximity may

28                                              - 16 -

1  make it more difficult to show causation, circumstantial evidence of a pattern of

2  antagonism following the protected conduct can also give rise to the inference." *Porter v.*

3  *Cal. Dep't of Corrections*, 419 F.3d 885, 895 (9th Cir. 2005) (internal quotation marks and

4  citation omitted).

**B.    A Reasonable Jury Could Not Find GDC4S Liable for Retaliation
Under § 3730(h).**

Cafasso contends GDC4S terminated her employment in retaliation for

investigating and reporting internally GDC4S was failing to comply with the company

policy and federal regulations that protect the Government's interest in GDC4S

inventions.  For her § 3730(h) claim to succeed at trial, Cafasso must prove:  (1) she was

engaging in conduct protected by the FCA, (2) GDC4S knew she was engaging in

protected conduct, and (3) GDC4S terminated her employment because of her protected

conduct.

**1.    The FCA Does Not Protect Cafasso's Investigating and
Reporting.**

There is evidence Cafasso believed GDC4S, under Jones's direction, was

intentionally failing to notify the Government of its intent to abandon patent prosecution

for certain inventions in which the Government had intellectual property rights until a

time that would disadvantage the Government and benefit GDC4S.  Cafasso reasoned

GDC4S would benefit by retaining certain inventions developed under Government

contracts as trade secrets and underbidding competitors for projects requiring application

of those trade secrets or perhaps by charging the Government for research and

development costs that would not actually be incurred on subsequent projects using those

trade secrets.  She suggests the Government would not know that subsequent projects

applied inventions developed under previous Government contracts because GDC4S did

not properly disclose some inventions to the Government.

This, and perhaps other business strategies, appeared to conflict with the TTRB

policy adopted under Motorola ownership and perhaps violate federal acquisition

regulations or contract provisions.  It may have seemed unfair or even fraudulent.  But Cafasso does not allege she investigated and reported—or even suspected—GDC4S had submitted a false claim, statement, or bill to the Government or had created a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the Government.

At the most, Cafasso could have suspected GDC4S, by omission, avoided transferring intellectual property rights to the Government.  But even if § 3729(a)(7) did not require that GDC4S affirmatively create a false record, the business strategy Cafasso challenged applied only to inventions having only a Government application and for which the Government already held unlimited intellectual property rights.  For those inventions GDC4S could not have had an obligation to transfer additional intellectual property rights.

"Violations of laws, rules, or regulations alone do not create a cause of action under the FCA."  *Hopper*, 91 F.3d at 1266.  Cafasso's acts could not reasonably have led to an FCA claim.  *See id.* at 1269 ("Her investigatory activity did not have any nexus to the FCA.")  Even assuming Cafasso in good faith did believe GDC4S was committing fraud subject to the FCA, a reasonable employee in the same or similar circumstances could not have.  *See Moore*, 275 F.3d at 845.  Therefore, Cafasso's investigating and reporting do not constitute acts "in furtherance of an action" under the FCA.[1]

### 2.      Even If the FCA Protected Cafasso's Conduct, GDC4S Did Not Know of Her Protected Conduct.

Even if Cafasso's investigating and reporting did constitute acts "in furtherance of an action" under the FCA, Cafasso did not report she suspected fraud or that GDC4S had submitted false claims or created false records or statements.  She requested an audit of

---

[1]This conclusion means the FCA claims, which have been dismissed with prejudice for failure to state a claim upon which relief can be granted, also are wanting under a summary judgment standard.

1   the Law Department for failing to comply with the TTRB.  She informed the Law

2   Department she believed it was violating company policy.  She complained to her

3   supervisor, but he did not give notice to anyone else that she suspected GDC4S of fraud,

4   submitting false claims, or creating false records.  Cafasso's job included ensuring

5   GDC4S's compliance with its Government contracts, and she repeatedly voiced concerns

6   about compliance.  None of her actions could have notified GDC4S she was acting in

7   furtherance of an FCA action.

8               **3.   Even If the FCA Protected Cafasso's Conduct and GDC4S Knew**
                        **of Her Protected Conduct, GDC4S Did Not Terminate Cafasso's**
9                       **Employment Because She Engaged in Protected Conduct.**

10          It is undisputed Marzilli alone made the decision to eliminate the CTO, which

11  included Cafasso's position, and when Marzilli decided to eliminate the CTO, he did not

12  know of Cafasso's concerns about compliance with the TTRB policy or federal

13  regulations.  He did not know she had requested an audit of the Law Department.  There

14  is no evidence—or evidence from which it may be inferred—he was persuaded by the

15  Law Department, or anyone else, to eliminate the CTO.

16          Instead, the undisputed evidence is General Dynamics Corporation acquired a

17  business unit in 2001 and merged it with another subsidiary in 2003.  Until late 2005, the

18  two units functioned substantially under separate leadership.  When Marzilli took control

19  of the Arizona unit, he chose to structure it consistently with the Massachusetts unit

20  already under his control.  The Massachusetts unit did not have a CTO.  Cafasso may not

21  have fully understood Marzilli intended to eliminate the entire CTO when he eliminated

22  the Chief Technology Officer position in November 2005, but it is not reasonable to

23  conclude Marzilli intended to retain a one-person CTO employing only Cafasso.

24          No later than January 2006, however, Cafasso knew that the entire CTO would be

25  eliminated, including her position as Chief Scientist/Technologist.  In May 2006, the final

26  determination that Cafasso would be discharged was made because she had not found

27  another position in the company within sixty days—not the decision to eliminate

28                                        - 19 -

1   Cafasso's position as Cafasso suggests.  Further, no evidence supports finding GDC4S

2   interfered with Cafasso finding another position within the company as retaliation for

3   Cafasso's reporting.

4          Thus, a reasonable jury could not conclude that in January 2006, when Cafasso

5   first told Marzilli about the issues she felt needed attention, Marzilli eliminated the CTO

6   and Cafasso's position in retaliation for reporting her concerns.

7                   **4.      Cafasso's Other Theories of Retaliation**

8          Cafasso contends GDC4S's motion does not challenge her theories of retaliation

9   based on GDC4S's actions against her after terminating her employment and even if

10  GDC4S prevails on its motion she will be able to present her other theories of retaliation

11  to a jury.  (Doc. #282 at 13 & n.1.)  However, Cafasso's Substitute Amended Complaint

12  does not allege any facts to support a claim for retaliation after termination.  In fact, it

13  barely mentions Cafasso's termination as an act of retaliation.  GDC4S's motion for

14  summary judgment on Cafasso's retaliation claim is not limited to specific theories of

15  liability or types of retaliation although it properly focuses on the only basis Cafasso

16  touched upon for her retaliation claim.  Moreover, as found below, the FCA does not

17  protect Cafasso's copying and removing of GDC4S files, and GDC4S's state court action

18  and Counterclaim in this action therefore cannot be retaliation for FCA-protected activity.

19         Therefore, GDC4S will be granted summary judgment on Count II (Retaliation) of

20  Relator's Substitute Amended Complaint.  Cafasso may not further litigate Count II under

21  new theories of retaliation.

22  **IV.    GDC4S's Counterclaim**

23         **A.      Legal Standard for Breach of Contract**

24         "[W]hen one person agrees to perform in a certain manner upon adequate

25  consideration and fails to keep the agreement, he is liable to the performing party for any

26  damages sustained as a result of his failure to perform."  *Graham v. Asbury*, 540 P.2d

27  656, 657 (Ariz. 1975).  To establish its counterclaim for breach of contract, GDC4S bears

28                                          - 20 -

1    the burden of proving:  (1) the existence of a valid contract; (2) its breach; and (3)

2    resulting damages.  *Id.*

3        **B.    GDC4S's Claim for Breach of Contract**

4        The existence of a contract and its breach are not disputed.  It is undisputed

5    Cafasso executed an Agreement in which she promised not to disclose any Confidential

6    Information to any person or entity not specifically authorized by GDC4S to receive it

7    and she disclosed Confidential Information, as defined by the Agreement,[2] to her

8    attorneys in violation of Section 2 of the Agreement.  It also is undisputed Cafasso

9    violated Section 5 of the Agreement both by removing copies of GDC4S documents and

10   files from GDC4S's premises and by failing to deliver all GDC4S materials and copies in

11   her possession to GDC4S promptly upon her termination.

12       Cafasso contends GDC4S has not incurred, disclosed, or proven damages.  Section

13   6 of the Agreement, however, provides that Cafasso acknowledged her failure to comply

14   with the Agreement "will irreparably harm the business" of GDC4S and entitle GDC4S to

15   injunctive and other equitable relief.  Section 6 further provides that in the event GDC4S

16   successfully enforces the Agreement against Cafasso, she will reimburse and indemnify

17   GDC4S for the actual costs incurred by GDC4S in enforcing the Agreement, including but

18   not limited to attorneys' fees.  Cafasso deprived GDC4S of its right under the Agreement

19   to keep its confidential information confidential, and GDC4S has spent three years

20   litigating to protect that right and is entitled to an injunction.  Although its legal expenses

21   are not yet quantified, there is no question GDC4S has been damaged.  Nor is there any

22   unfair surprise to Cafasso.

23

24   _____

25       [2]Although Cafasso now contends that GDC4S has not met its burden of proving that
     any of the wrongfully copied files contained trade secret or privileged documents, she

26   admitted in her state court answer that she downloaded "more than ten gigabytes of the
     Company's confidential, proprietary, and trade secret information" and copied that data onto

27   removable storage devices.

28

1    In defense to GDC4S's breach of contract claim, Cafasso contends the FCA

2  protects her conduct violating the Agreement because "[p]ublic policy grants Relator a

3  privilege in gathering copies of documents as part of an investigation under the FCA and

4  gives Relator immunity from civil liability based on claims against her for so doing."  She

5  contends conferring with a government investigator constitutes "cooperating with the

6  government," and by doing so before she made copies of GDC4S's files, removed them,

7  and refused to return them, her actions became a privileged investigation of a potential

8  FCA *qui tam* action.  But Spitza did not ask or authorize Cafasso to do anything in

9  violation of her Agreement (or the law).  That he did not affirmatively instruct Cafasso not

10  to copy and remove files does not transform her actions into "cooperation with the

11  government."  Moreover, Cafasso never gave Spitza the files she copied.  None of the

12  authority on which Cafasso relies supports her position.  *See Forro Precision, Inc. v. IBM*

13  *Corp.*, 673 F.2d 1045, 1051, 1053-54 (9th Cir. 1982) (IBM assisted the San Jose Police

14  Department, with the involvement and consent of the Santa Clara County District

15  Attorney, in executing a search warrant by examining the seized material to ensure it

16  matched that described in the warrant); *Caesar Elecs. Inc. v. Andrews*, 905 F.2d 287, 288,

17  289 (9th Cir. 1990) (manufacturer complied with instructions of U.S. Customs

18  investigating illegal transaction and obtained letters from the U.S. Departments of Justice

19  and Commerce confirming it was acting with the knowledge and consent of those

20  departments and would not be subject to any liability for possible violations of American

21  export laws as the result of its cooperation in the investigation); *U.S. ex rel. Grandeau v.*

22  *Cancer Treatment Centers of America*, 350 F. Supp. 2d 765, 770 (N.D. Ill. 2004) (FCA

23  did not immunize relator's secret delivery of confidential documents to the government in

24  compliance with a subpoena not addressed personally to relator).

25    Public policy does not immunize Cafasso.  Cafasso confuses protecting

26  whistleblowers from retaliation for lawfully reporting fraud with immunizing

27  whistleblowers for wrongful acts made in the course of looking for evidence of fraud.  The

28                                    - 22 -

1  limitation of statutory protection for retaliation to "lawful acts done by the employee"

2  weighs against any inference of a broad privilege for Cafasso to breach her contract with

3  GDC4S. Statutory incentives encouraging investigation of possible fraud under the FCA

4  do not establish a public policy in favor of violating an employer's contractual

5  confidentiality and nondisclosure rights by wholesale copying of files admittedly

6  containing confidential, proprietary, and trade secret information.  Although the

7  Agreement might be unenforceable if the interest in its enforcement is outweighed in the

8  circumstances by a substantial public interest, *e.g.*, the public interest in filing an FCA *qui*

9  *tam* action, that would be harmed by enforcement of the Agreement, such an interest is not

10 harmed by enforcement of the Agreement in these circumstances.  *See U.S. ex rel. Green*

11 *v. Northrop Corp.*, 59 F.3d 953, 962-63 (9th Cir. 1995).  In fact, Cafasso filed a FCA *qui*

12 *tam* action before she or her attorneys reviewed the files she copied and removed from

13 GDC4S's premises.

14      Further, there is no evidence Cafasso needed to remove copies of the files to avoid

15 destruction of evidence in support of her FCA claim.  Although Cafasso told Spitza she

16 feared document destruction, she testified her concern was that two databases were to be

17 transferred from the CTO to the Law Department and the Law Department may not

18 continue to use those databases.  She said she was not concerned the documents would be

19 destroyed, just the databases.  Moreover, Cafasso's copying and removing was not limited

20 to files in the two databases or to files within the time period during which the alleged

21 fraud occurred.

22      Finally, Cafasso's characterization of *O'Day v. McDonnell Douglas Helicopter*

23 *Co.*, 79 F.3d 756 (9th Cir. 1996), as permitting "an employee to surreptitiously gather

24 documents related to an employer's unlawful conduct" is incorrect.  In *O'Day*, the Ninth

25 Circuit applied the Title VII balancing test for determining whether an employee's conduct

26 constitutes "protected activity" to a retaliation claim under the Age Discrimination in

27

28

1    Employment Act.  *Id.* at 763.  The balance tipped in favor of the employer's interest in

2    maintaining a harmonious and efficient operation.  *Id.*  The court explained:

3             In balancing an employer's interest in maintaining a "harmonious and
              efficient" workplace with the protections of the anti-discrimination laws, we
4             are loathe to provide employees an incentive to rifle through confidential
              files looking for evidence that might come in handy in later litigation.  The
5             opposition clause protects reasonable attempts to contest an employer's
              discriminatory practices; it is not an insurance policy, a license to flaunt
6             company rules or an invitation to dishonest behavior.

7    *O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 762-64 & n.6 (9th Cir. 1996).

8         Thus, the FCA does not immunize Cafasso for her breach of Sections 2 and 5 of the

9    Agreement.  Summary judgment on Count I (Breach of Contract) of GDC4S's

10   Counterclaim will therefore be granted in favor of GDC4S.

11        **C.    GDC4S's Other Claims**

12        In addition to Count I for breach of contract, GDC4S's Counterclaim includes the

13   following five counts:  (2) misappropriation of trade secrets, (3) conversion, (4) breach of

14   fiduciary duty, (5) common law fraud/fraudulent misrepresentation, and (6) computer

15   fraud and abuse.  In its Motion for Partial Summary Judgment, GDC4S states if it obtains

16   summary judgment on Count I of its Counterclaim, it will agree to dismiss its remaining

17   counterclaims.  Because the Court will grant GDC4S summary judgment on Count I of its

18   Counterclaim, the remaining counts will be treated as voluntarily dismissed, and Cafasso's

19   motion for summary judgment on the remaining counterclaims will be denied as moot.

20   **V.    Conclusion**

21        GDC4S is entitled to summary judgment on Cafasso's retaliation claim.  Although

22   Cafasso may have believed she was investigating what she suspected to be fraud, no

23   reasonable employee could have believed what she suspected reasonably could have led to

24   an action under the FCA.  Further, GDC4S did not know she was engaging in conduct

25   protected by the FCA, and GDC4S terminated her employment as a result of a strategic

26   business decision, not in retaliation for FCA-protected activity.

27

28

1    GDC4S also is entitled to summary judgment on its breach of contract

2   counterclaim.  Cafasso agreed not to disclose GDC4S's confidential information without

3   authorization, not to remove any copies of GDC4S's documents and data from GDC4S's

4   premises, and to promptly deliver to GDC4S all such material and copies in her possession

5   and control upon termination or at any time requested.  She violated each of those

6   agreements causing irreparable harm to GDC4S, and the FCA does not immunize her.

7    IT IS THEREFORE ORDERED that Relator's Motion for Summary Judgment on

8   Defendant's Counterclaims (doc. #275) is denied.

9    IT IS FURTHER ORDERED that GDC4S's Motion for Partial Summary Judgment

10   on:  (1) Count II of Relator's Substitute Amended Complaint (Retaliation) and (2) Count I

11   of GDC4S's Counterclaim (Breach of Contract) (doc. #272) is granted.

12    IT IS FURTHER ORDERED that Counts II through VI of GDC4S's Counterclaim

13   are dismissed without prejudice on motion of GDC4S, but without leave to refile them in

14   this or any other action.

15    DATED this 21st day of May, 2009.

16

17

18   _____

19                Neil V. Wake
                 United States District Judge

20

21

22

23

24

25

26

27

28
                              - 25 -